KEITH SMITH, et al., etc.,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　No.　03 C 9110
　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
NIKE RETAIL SERVICES, INC., etc.,　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendant.　　　)

## MEMORANDUM OPINION AND ORDER

Eighteen current and former employees of Nike Retail Services, Inc. ("Nike") have brought a two-count Complaint against Nike, alleging that both they and similarly situated African-American Nike employees were discriminated against based on their race. In particular plaintiffs allege violations of both Title VII of the Civil Rights Act of 1991 ("Title VII," 42 U.S.C. §§2000e to 2000e-17) and 42 U.S.C. 1981 ("Section 1981"). Plaintiffs have now moved for certification of multiple classes (one overall class and four subclasses) of African-American Nike employees under Fed. R. Civ. P. ("Rule") 23. This Court certifies all of the proposed classes for the reasons and on the terms stated in this memorandum opinion and order.

## Background

Nike is a "designer, marketer and distributor of authentic athletic footwear, apparel, equipment and accessories" (N. Mem

3).[1]  Among other activities, it operates "Niketown" retail stores, including its flagship "Niketown Chicago" location ("Nike Chicago").  Like many large corporations, Nike has in place a number of corporate-wide policies addressing a wide array of employment and personnel issues, including general discrimination and harassment policies as well as policies governing hiring and promotion, workplace discipline, employee discounts, time and attendance requirements and employment benefits.  In practice, however, the actual application and enforcement of those policies are left to the discretion of the store managers at individual stores.  Here plaintiffs charge that, supported by that decentralized delegation of discretion to Nike Chicago's managers, Nike has subjected Nike Chicago's African-American employees to a variety of discriminatory practices.

Those asserted practices cover a wide and, if the charges are true, appalling range.  To avoid the constant repetition of the phrase "plaintiffs claim" or the like, the following litany will simply recite the claims--without of course implying any factual findings either way by this Court:

           1.  Nike segregated its African-American employees into

---

[1] This opinion will cite to plaintiffs' and Nike's memoranda of law as "P. Mem.--" and "N. Mem.--," to plaintiffs' reply memorandum as "P.R. Mem.--," to plaintiffs' exhibits as "P. Ex.--" and to plaintiffs' Second Amended Complaint as "SAC ¶--."  Finally, declarations and depositions will be cited "Dec. ¶--" and "Dep.--."

2

its lowest level and worst-paid jobs--stockroom and cashier positions--as evidenced by, among other things, a significant disparity between the number of African-Americans and the number of Caucasians employed in those positions.

2.  African-American employees were denied equal opportunity for promotions to more attractive positions. Nike allegedly failed to post job openings, discouraged African-American employees from applying for promotions and hired less-qualified Caucasian applicants rather than those African-American employees who did apply.

3.  Nike Chicago applied workplace rules and meted out discipline--up to and including termination--in a racially biased manner.  For example, both employee discount policies and time and attendance rules were applied more rigorously against African-American than against Caucasian employees (between December 1999 and August 2004 more than 33% of Nike Chicago's African-American employees were terminated for rules violations, while only 8% of Caucasian employees received such treatment during that time).

4.  Nike Chicago "routinely" denied employment benefits to African-American employees by predominantly hiring African-Americans into part-time rather than full-time positions and by denying appropriate benefits to those who,

3

though officially (that is, technically) part-time, worked enough hours to be entitled to such benefits.

5. Plaintiffs and their fellow African-American employees were subjected to a hostile working environment created by a congeries of harassing activity, including the use of racial epithets, accusations and coercive interrogations regarding asserted theft and misuse of employee discounts, their subjection to greater scrutiny and monitoring than their Caucasian co-workers (including extensive "check out" searches upon leaving the store) and--to add to the total mix--greater scrutiny and monitoring of African-American customers than of their Caucasian counterparts.

### Proposed Class Definitions

In seeking relief for those alleged discriminatory practices, plaintiffs now offer for certification one overall class and four subclasses of current and former African-American Nike Chicago employees. In the ensuing listing the overall class is referred to first, with the subclasses following thereafter (and in each instance the class or subclass designation in quotation marks is plaintiffs'):[2]

---

[2] All of the subclasses' claims are advanced under both Title VII and Section 1981, but the overall class asserts only a Section 1981 claim (its earlier-advanced Title VII claim was dismissed on timeliness grounds by this Court's November 17, 2004 oral ruling).

1. "Hostile Work Environment," comprising all African-Americans employed by Nike Chicago at any time between December 17, 1999 and the present (P. Mem. 24). Class representatives are all of the plaintiffs named in the SAC: Crystal Barbee ("Barbee"), Anthony Barlow ("Barlow"), Anthony Brown ("A. Brown"), Billy Brown ("B. Brown"), Dwight Brown ("D. Brown"), Vernetta Duckworth ("Duckworth"), Marquisha Hudson ("Hudson"), Robert Jackson ("Jackson"), John Lewis ("Lewis"), Todd Lindberg ("Lindberg"), Ria McDougal ("McDougal"), Janise Page ("Page"), Larry Posey ("Posey"), Jason Readus ("Readus"), Shu-Ra Rogers ("Rogers"), Kevin Smith ("Smith"), Jacques Walker ("Walker") and DaJuana Young ("Young").

2. "Job Segregation/Wage Disparity" ("Job Segregation"), comprising all current and former African-American Nike Chicago employees during the period between December 17, 1999 and the present who were assigned to lower paid positions in the stockroom or as cashiers because of their race (P. Mem. 24). That subclass' representatives are D. Brown, Hudson, Jackson, McDougal, Smith, Walker and Young.

3. "Promotion," comprising all current and former African-American Nike Chicago employees during the period between December 17, 1999 and the present who "were denied promotions or deprived of the ability to pursue promotions because of their race" (P. Mem. 24). That subclass' representatives are Barlow, A. Brown, B. Brown, D. Brown, Duckworth, Hudson, Jackson, Lewis, McDougal, Posey, Readus, Smith, Walker and Young.[3]

---

[3] Nike briefly objects to the definition of both the Promotion and Job Segregation subclasses as "overbroad" (N. Mem. 6 n.6). As to the definition of the Job Segregation subclass, Nike argues that while "segregation claims have been limited throughout this litigation to African-Americans being hired into stockroom positions," the definition offered in plaintiffs' motion suddenly expands the subclass to include those hired into cashier positions as well (id.). Nike objects on similar grounds to the Promotion subclass' inclusion of persons claiming denial of promotion to positions other than sales (id.). To be sure, plaintiffs have greatly altered and refined their class definitions since the pleadings were filed. Although the pleadings did single out particular categories of discriminatory conduct, they did not make clear that plaintiffs would be seeking

5

4. "Discipline," comprising all current and former African-American Nike Chicago employees during the period between December 17, 1999 and the present who "suffered from racially-biased application workplace rules and regulations, including but not limited to, time and attendance, employee discount, employee checkouts, suspensions, and terminations" (P. Mem. 24-25). All 18 named plaintiffs are that subclass' representatives.

5. "Benefits," comprising all current and former African-American part-time Nike Chicago employees during the period between December 17, 1999 and the present who applied for, requested and/or were entitled to benefits but were denied those benefits because of their race (P. Mem. 25). That subclass' representatives are Barbee, A. Brown, D. Brown,[4] Duckworth, Hudson, Jackson, Readus, Smith and Young.

Nike presents two threshold objections to those definitions. First, although it does not dispute that the Section 1981 statute of limitations as specified under 28 U.S.C. §1658 allows plaintiffs' claims to be based on conduct occurring as far back as December 17, 1999--four years before this action was filed

---

to certify separate classes based on those categories, let alone attempt to define those classes (see, e.g., SAC ¶¶30-43, 118, 120). While plaintiffs can on occasion be held to class definitions identified in their pleadings (see, e.g., Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd., 94 F.R.D. 147, 149 n. 3 (N.D. Ill. 1982)), this Court declines to do so here, where the parties have already joined battle as to the multiple classes addressed in this opinion. Even so, plaintiffs are ordered promptly to amend the SAC under Rule 15(b) to conform to the current class definitions.

[4] Plaintiffs appear to have mistakenly referred to "B. Brown" rather than "D. Brown" as a representative for the "Benefits" subclass in their initial memorandum (P. Mem. 25; P.R. Mem. 30). As Nike has raised no objection to that apparent typographical error and has itself referred to testimony by both plaintiffs in its discussion of the subclass (N. Mem. 18), this opinion will treat D. Brown as the intended class representative.

6

(see, e.g., <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 382 (2004))[5]--Nike argues that the time frame should be further limited to the tenures of two specific Nike Chicago managers-- Human Resources and eventual Store Manager Lori Wigod ("Wigod") and Loss Prevention Manager Dan Cruz ("Cruz") (N. Mem. 20). While Wigod and Cruz are certainly "directly and consistently implicated" in a sizeable portion of the allegedly discriminatory conduct (P. Mem. 33-34), plaintiffs are just as certainly attacking more than the behavior of two rogue managers (see, e.g., P. Mem. 4, 17; P.R. Mem. 44). Because what is at issue instead is a claimed store-wide "pervasive" array of discriminatory conduct carried out by numerous managers (P. Mem. 1), it would clearly be wrong to limit the classes to only those employees whose employment overlapped with that of Wigod or Cruz.

Nike's second objection is that even if December 17, 1999 is the appropriate cutoff date under Section 1981, plaintiffs have nevertheless included in their evidentiary offerings testimony concerning conduct before that date (N. Mem. 22).[6] That

---

[5] Plaintiffs' Title VII claims are subject to a far shorter temporal bar: Only discriminatory conduct that occurred not more than 300 days before the first EEOC filing by a named plaintiff (in this case Keith Smith's October 4, 2002 filing) is actionable under that rubric (<u>Koelsch v. Beltone Elecs. Corp.</u>, 46 F.3d 705, 707 (7th Cir. 1995)).

[6] See, e.g., Jones Dec. ¶¶2-7; Pinkston Dec. ¶¶2-14.

7

objection is groundless, for any such earlier conduct that may be probative (for example as to the employer's discriminatory intent) is admissible in evidence though it is itself nonactionable because of limitations--as Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)(hereafter cited as "Amtrak") has put it succinctly as to Title VII claims (and as is equally applicable to Section 1981 claims):

> Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

## Class Certification Standards and Analysis[7]

Plaintiffs seeking class certification bear the burden of demonstrating that their proposed class satisfies both (1) the four requirements of Rule 23(a)--in common parlance numerosity, commonality, typicality and adequacy of representation--and

---

[7] This Court rarely takes the occasion to write in ruling on class certification in cases on its calendar, both because the issues posed by the litigants' areas of disagreements can most often be dealt with orally in comparatively short order and (relatedly) because one more entry into an already overcrowded field almost never adds anything to the corpus juris. When this Court does write as here, most of the case citations naturally tend to refer to District Court opinions (it was not until the 2003 amendments to Rule 23 that the new Rule 23(f) made orders granting or denying class certification subject to possible appeal). That being so, it must be recognized that such District Court opinions (including those by this Court) are nonprecedential. In this instance both the issuance and the length of this written opinion are occasioned by the several proposed classes requiring separate discussion and by Nike's unacceptably cramped approach to the standards for certification, not by any venture on this Court's part that goes beyond the well-marked-out boundaries for class certification.

8

(2) one of the three alternatives defined in Rule 23(b) (<u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 613-17 (1997)). While race discrimination lawsuits are often "by their very nature" class actions (<u>E. Tex. Motor Freight Sys. v. Rodriguez</u>, 431 U.S. 395, 405 (1977)), certification in such cases is not automatic, and courts must still engage in a "rigorous analysis" of a proposed class' compliance with the Rule 23 prerequisites (<u>Warnell v. Ford Motor Co.</u>, 189 F.R.D. 383, 387 (N.D. Ill. 1999), citing <u>Gen. Tel. Co. of the Sw. v. Falcon</u>, 457 U.S. 147, 161 (1982)(hereafter cited as "<u>Falcon</u>")).

Contrary to P. Mem. 28's contention (one based at least in part on a misreading of this Court's opinion in <u>Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.</u>, 231 F.R.D. 280 (N.D. Ill. 2005)), it is not true that a court faced with a class certification motion "should accept as true all of Plaintiffs' allegations and supporting evidence"--exactly the opposite was said in <u>Szabo v. Bridgeport Machs., Inc.</u>, 249 F.3d 672, 675, 677 (7th Cir. 2001)). On the other hand, a court in this posture should not be making a determination of the merits of the case either (<u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 177-78 (1974)). Instead courts must walk a fine line, and one not always "easily discernible" (<u>Retired Chicago Police Ass'n v. City of Chicago</u>, 7 F.3d 584, 599 (7th Cir. 1993)), between those two extremes--an approach that allows for a "preliminary inquiry"

into the merits, but only to the extent needed to deal with Rule 23 considerations, just as this Court said in <u>Owner-Operator</u>, 231 F.R.D. at 286 (citing <u>Szabo</u>, 249 F.3d at 676).

Rule 23(a)

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." While a plaintiff need not identify each class member or even provide an exact number of class members to satisfy that element (<u>Marcial v. Coronet Ins. Co.</u>, 880 F.2d 954 (7th Cir. 1989)), he or she is required to offer at least a good faith estimate as to the class size (<u>Radmanovich v. Combined Ins. Co. of Am.</u>, 216 F.R.D. 424, 431 (N.D. Ill. 2003)).

Rule 23(a)(2) demands that there be questions of law or fact common to the class. To that end it is ordinarily enough to show that the class members share a "common nucleus of operative fact" (<u>Keele v. Wexler</u>, 149 F.3d 589, 594 (7th Cir. 1998)). In particular, commonality generally exists when the defendant has engaged in "standardized conduct" toward the members of the proposed class (<u>id</u>.).

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is satisfied by a representative plaintiff's claim that "arises from the same event or practice or course of conduct that gives rise to the claims of other class

members and his or her claims are based on the same legal theory" (Keele, 149 F.3d at 595, quoting De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983)).

Finally, Rule 23(a)(4) requires prospective class representatives to demonstrate that they will "fairly and adequately protect the interests of the class." In that respect a named plaintiff (1) must not have claims antagonistic to or in conflict with those of the other class members, (2) must have sufficient interest in the outcome of the litigation to ensure "vigorous advocacy" and (3) must have experienced and competent counsel (Weizeorick v. ABN AMRO Mortgage Group, Inc., No. 01 C 713, 2004 WL 1880008, at *5 (N.D. Ill. Aug. 3)).

## Hostile Work Environment

In establishing numerosity for their hostile work environment class, plaintiffs contend that the class should encompass all African-Americans employed by Nike Chicago between December 17, 1999 and the present--a group of over 230 individuals, according to Nike Chicago's personnel records (P. Mem. 30). While there is no magic number that automatically satisfies numerosity, it is often said that 40 members (Toney v. Rosewood Care Ctr., Inc., No. 98 C 0693, 1999 WL 199249, at *6 (N.D. Ill. Mar. 31)), or even fewer (Markham v. White, 171 F.R.D. 217, 221 (N.D. Ill. 1997)), are enough to make up a class. It is beyond cavil that the much larger class size urged by plaintiffs

11

would make joinder impracticable (id.).

Nike argues in opposition that plaintiffs' figure is inflated. As Nike would have it, some plaintiffs have said they were not witness to, or were not subjected to, some or all of the alleged harassing conduct, so that they could have no hostile work environment claims (N. Mem. 52).[8] Even if this Court were to accept Nike's contention--something that would likely involve an inappropriate inquiry into the merits (Markham, 171 F.R.D. at 221)--all it would demonstrate is that in the end plaintiffs' contended-for class size is not 100% accurate. But all that plaintiffs need do at this stage is to present a good faith estimate (Radmanovich, 216 F.R.D. at 431), and they have surely done so here.

Nike also challenges commonality, claiming in essence that the purported class members' claims and experiences are too individualized for commonality to exist (N. Mem. 41). For example, Nike observes that different class members were subjected to different forms and intensities of harassment--due in part, Nike supposes, to their having worked different shifts under different supervisors--and that individual class members' differing circumstances open their claims to a variety of

---

[8] Because Nike advances the same challenge to each of the proposed subclasses, and because what is next said in the text is equally true as to those subclasses as well, numerosity need not (and will not) be addressed in like detail in the later sections of this opinion.

idiosyncratic defenses (N. Mem. 36-40). But that is at odds with our Court of Appeals' teaching--both in general and in the specific context of hostile work environment claims--that individualized factual variations among class members need not destroy commonality (Keele, 149 F.3d at 594)--a teaching of course heeded by District Courts in this Circuit. Here plaintiffs have presented a sufficient showing that despite their varied experiences and circumstances the class members do share at least one common question: whether there existed an overarching and pervasive hostile work environment at Nike Chicago. That being so, plaintiffs have satisfied commonality (Wilfong v. Rent-A-Center, Inc., No. 00 CV 680-DRH, 2001 WL 1795093, at *5 (S.D. Ill. Dec. 27)); Warnell, 189 F.R.D. at 390).

Nike takes a similar tack in contesting the typicality of the named plaintiffs, arguing that some of them differ from the class members they purport to represent in terms of both their experience of harassment and the defenses to which their claims are susceptible (N. Mem. 37-40). Again, though, Nike has made too much of such differences. Much as in the commonality context, it is simply not "require[d] that each member of a class suffer precisely the same injury as the named class representatives" (De La Fuente, 713 F.2d at 232-33). "[F]actual distinctions between the claims of the named class members and those of other class members" need not block a typicality finding

13

(id.)--instead the question is whether the claims of the former "have the same essential characteristics" as those of the latter (Retired Chicago Police Ass'n, 7 F.3d at 597), looking to "the company's actions" rather than to any "particularized defenses it might have against certain class members" (Wagner v. NutraSweet Co., 95 F.3d 527, 534 (7th Cir. 1996)).[9]

Despite that teaching, Nike first argues that many plaintiffs' experiences are not representative of the class because they "concede that they personally were never subjected to such [racially harassing] practices at all" (N. Mem. 37, emphasis in original). But the portions of the record cited by Nike fail to support such an all-encompassing claim. Rather than demonstrating that such plaintiffs experienced no harassing conduct at all, as Nike suggests, the cited testimony shows only that some plaintiffs did not experience particular kinds of the numerous varieties of harassing conduct of which the class complains (N. Mem. 5 n.3). It would be truly extraordinary if each named plaintiff had suffered each variety of alleged harassment described by their counsel. Instead they share with

[9] To be sure, Hardy v. City Optical Inc., 39 F.3d 765, 770 (7th Cir. 1994) has said that a named plaintiff against whom the employer has a unique defense "is not an appropriate class representative"--but Hardy went on to recognize that a meritorious class action could be salvaged by finding another class representative even if the individual's claim were dismissed. That of course does not blunt the force of the later opinion in Wagner, which is clearly on point in terms of the different situation posed by this case.

class members the common essential claim that a hostile work environment, manifested in a variety of ways, existed at Nike Chicago during the relevant time period--and that satisfies the typicality element. In the same vein, the possibility that a few named plaintiffs may not have complained of harassment-- potentially opening their claims up to an affirmative defense under _Burlington Indus., Inc. v. Ellerth_, 524 U.S. 742 (1998)-- does not block a finding of typicality (see, e.g., _Radmanovich_, 216 F.R.D. at 433; _Toney_, 1999 WL 199249, at *8).[10]

Finally, as to Rule 23(a)(4), Nike suggests that the class is not adequately represented because one of its named plaintiffs is a manager who allegedly engaged in some of the very conduct of which the class complains: failing to act on complaints of harassment (N. Mem. 26). While it is certainly true that having supervisors represent nonsupervisory employees can create conflicts sufficient to undercut adequacy of representation (_Radmanovich_, 216 F.R.D. at 434), this is not such a case.

In that respect the deposition excerpts cited by Nike offer little evidence of such a conflict. Instead they show only that

---

[10] Again Nike overstates the record when it claims that some plaintiffs admitted that "they never reported any concerns about racial harassment to anyone in management" (N. Mem. 6; accord, N. Mem. 39). For example, the cited testimony of plaintiffs Readus and Young reflects only that they had not complained about _particular instances_ of harassing conduct, not that they had never complained about _any_ concerns as to racial harassment (Readus Dep. 170; Young Dep. 116-17).

complaints were made to African-American managers, and they offer little if any information about what those managers might have done or failed to do with that information (N. Mem. 6).[11] But in any case the fundamental test for adequate representation is whether the named plaintiffs "possess the same interest and suffer the same injury as the class members" they represent (Amchem, 521 U.S. at 625-26 (citation and internal quotation marks omitted)). Here the strength of the common injury and interest shared by the named plaintiffs and class members--the harm caused by an allegedly hostile work environment and the interest in eliminating that environment--plainly overrides any potential conflicts (Jefferson v. Windy City Maint., Inc., No. 96 C 7686, 1998 WL 474115, at *9 (N.D. Ill. Aug. 4)).

## Job Segregation

Nike's own employment records reflect that there were over 130 African-Americans employed in either stockroom or cashier positions during the relevant period (P. R. Mem. 15). Hence what was said as to numerosity in the hostile work environment context applies here too.

As to commonality, there are of course differences among the

---

[11] One plaintiff admitted he didn't know what the manager did about his complaint (D. Brown Dep. 89-90, 96), another simply never addressed the issue at all (Jackson Dep. 74-77) and the third, himself a manager, testified that he actually recommended that the complaining employee take "the next step" and bring his complaint to the operation manager (Barlow Dep. 225-29).

various class members' circumstances and experiences of the alleged "job segregation" (N. Mem. 42-43). But it has already been said that the existence of such factual variations does not negate that element so long as at least one common question exists. Here, at a minimum, there is such a question: whether Nike discriminated in assigning positions to African-American employees by means of "a corporate policy that [leaves] hiring decisions to the unfettered discretion of NTC's 'local level' managers" (P.R. Mem. 16). While proving that such a decentralized and subjective decisionmaking process is discriminatory may perhaps "be extremely difficult" (<u>Caridad v. Metro-North Commuter R.R.</u>, 191 F.3d 283, 291 (2d Cir. 1999)), that future possibility does not preclude a finding of commonality (<u>id</u>. at 291-92). To the contrary, a demonstration (often via anecdotal or statistical evidence or both) that such a subtle form of discrimination has been common to class members can suffice (<u>id</u>. at 292; <u>Adams v. R.R. Donnelley & Sons</u>, No. 98 C 4025, 96 C 7717, 2001 WL 336830, at *9, 13 (N.D. Ill. Apr. 6)).[12]

---

[12] At various points (see, e.g., N. Mem. 44, 49) Nike argues, relying on <u>Falcon</u>, that because the decision-making process is not <u>fully</u> subjective--because there are at least some objective criteria guiding the hiring process--this avenue is not available to plaintiffs. Such an argument is out of place here. This is not an attempt, as in <u>Falcon</u>, to use one plaintiff's experience of one kind of discrimination as a basis for a class-wide claim that the defendant discriminated in other ways as well--a so-called "across-the-board" attack (<u>Falcon</u>, 457 U.S. at 157-59). Plaintiffs have rather have taken care to create individual classes (indeed, subclasses) for each form of alleged

17

Here plaintiffs have produced both statistical and anecdotal evidence in support of their argument. First plaintiffs point to Nike's own employment records showing a marked racial disparity in both the stockroom and cashier positions during the relevant time period: 79 African-Americans as opposed to 8 Caucasians were employed in the stockroom, while 57 African-Americans as compared with 15 Caucasians were employed as cashiers (P.R. Mem. 17-18). While as Nike argues the plaintiffs' failure to control for some relevant variables (such as the racial makeup of the applicant pool) may well undermine the eventual persuasiveness of that statistical data at trial (N. Mem. 44-46), such an inquiry into the merits of that data would involve "statistical dueling" inappropriate at this stage of the litigation (Caridad, 191 F.3d at 292; Wilfong, 2001 WL 1795093, at *3 n.5; Radmanovich, 216 F.R.D. at 431 n.2). And plaintiffs further support those statistics with anecdotal evidence from African-American applicants who were hired into stockroom or cashier positions, even those who voiced no preference for such positions, or in

discrimination, avoiding many of the difficulties of across-the-board claims. Indeed, even if this were an across-the-board situation (as it is not), Falcon's reference to "entirely subjective decisionmaking processes" is not presented as a requirement, but only as part of a footnoted list of potential ways that a plaintiff might be able to satisfy commonality and typicality in such a situation (id. at 159 n.15; see, e.g., Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 322, 330-31 (N.D. Ill. 1995), finding commonality where the defendant allowed low level managers discretion to apply neutral underwriting criteria).

some cases who affirmatively sought other positions (P. Mem. 13-14). Such statistical and anecdotal evidence establishes commonality.

Nike's challenge to this subclass' typicality similarly fails. As with the overall class, plaintiffs claim that Nike discriminated against them by placing them in less desirable positions--either as cashiers or in the stockroom, either upon hiring or later in their tenure--due to their race. In the face of such "similarity of legal theory," such that both the named plaintiffs and the class members were "subject to the same allegedly unlawful practices," any differences of fact that exist between the two are insufficient to negate typicality (De La Fuente, 713 F.2d at 232).

Finally, Nike contests the adequacy of the named subclass representatives, claiming that they are unsuitable representatives because they were in competition with their fellow class members for the same positions (N. Mem. 27). While Patterson v. Gen. Motors Corp., 631 F.2d 476, 482 (7th Cir. 1980) did note the possibility that such competition might sometimes impact the adequacy of representation, this Court has previously made clear its rejection of such an argument in a context more comparable to the present one (Meiresonne v. Marriott Corp., 124 F.R.D. 619, 625 (N.D. Ill. 1989)).

Promotion

Plaintiffs estimate that "all or most" of the over 230 African-Americans employed by NTC during the relevant period were either denied promotions or deprived of the ability to pursue promotions due to their race (P.R. Mem. 24). At this threshold stage that meets the numerosity requirement despite Nike's standard objection.

Plaintiffs have also demonstrated that this subclass satisfies commonality. While Nike again contends that the circumstances surrounding individual class members' claims are idiosyncratic (N. Mem. 42-44), plaintiffs have produced evidence of a question common to all class members: whether they were subjected to "diminished promotional opportunities" due to the "discretion and subjective decision making power" wielded by NTC managers (P.R. Mem. 21). Although plaintiffs offer no supporting statistical evidence, they provide considerable anecdotal evidence of promotional discrimination--describing unposted openings, denied applications for promotions and repeated discouragements of employees from applying in the first place (P. Mem. 15-16; P.R. Mem. 21-22). Some of those experiences may well have legitimate explanations--for example, Nike offers its own statistical evidence to show there was no promotional discrimination at Nike Chicago--but such explanations, as well as inferences sought to be drawn from Nike's statistics, address the

merits of the class members' claims and not the relevant current question: whether the class members' claims are similar enough to warrant class treatment. On that score, plaintiffs' evidence suffices.

One limitation operates in that respect, at least for the present. It will be recalled that plaintiffs' basis for commonality points to the role of "local level" managers in carrying out promotional discrimination. While it is of course conceivable that even managers have been similarly subjected to such discrimination (perhaps by managers farther up the ladder but still "local," such as Store Manager Wigod), plaintiffs have identified no instance of such actions being taken against managers[13]--and if there were any such instances, it would also seem unlikely that they would add up to meet a numerosity test. So for now commonality will extend only to non-managerial African-American employees, and this subclass' definition is limited accordingly (see Breedlove v. Tele-Trip Co., No. 91 C 5702, 1993 WL 284327, at *8 (N.D. Ill. July 27)).

As to typicality, Nike's challenges echo those it made to commonality, and once more they fall short. Again factual

---

[13] Plaintiffs do offer evidence that Barlow, a manager, was denied a promotion, but the position he was denied was as store manager of the Atlanta store (Barlow Dep. 112-15, 150). Both the cited deposition excerpt and common sense suggest that the decision not to hire Barlow for that job was not made by a local Nike Chicago manager.

21

differences in individual claims do not denote a lack of
typicality where, as here, the named plaintiffs claim to have
been victimized by the same "practice or course of conduct" as
their fellow class members (Keele, 149 F.3d at 595): that they
were subjected to "diminished promotional opportunities" due to
the "discretion and subjective decision making power" wielded by
Nike Chicago managers. Of course proposed named plaintiff
Barlow, as a manager himself, would likely have a difficult time
demonstrating typicality, but the just-ruled exclusion of
managers from this subclass in general moots any such concern.

Barlow's absence from the subclass also moots one of Nike's
concerns as to adequate representation. As Nike points out,
several class members testified that Barlow was involved in the
promotion-related actions and decisions of which they complain
(N. Mem. 27). While that conflict of interest is far more
serious, and has far better evidentiary support, than that
earlier addressed in the hostile work environment context, it
does not affect the subclass' satisfaction of this final element.
Instead, Barlow's removal as a putative subclass representative
avoids the conflict (see Bell, 2005 WL 23340, at *3).

Nike's other objection to adequacy revisits its claim that
competition between class members and class representatives for
the same jobs creates a prohibitive conflict of interest (N. Mem.
27). As before such competition is insufficient to negate

22

adequacy of representation.

## Discipline

As for numerosity, plaintiffs have produced a variety of accounts of African-American employees being subjected to disparate application of Nike Chicago work rules and punishments, as well as noting that 72 African-American Nike Chicago employees were terminated for violating store rules. While (as discussed later) plaintiffs' suggestion (P. Mem. 31) that all African-Americans employed by Nike Chicago during the relevant period would be part of the subclass is surely overinclusive, their presentations amply demonstrate that the Discipline subclass would still be large enough to make joinder impracticable.

As to commonality, Nike once more argues that individual discipline-based claims would be too particularized (N. Mem. 48). Again plaintiffs have produced enough anecdotal and statistical evidence that class members were subjected to the same general discriminatory application of discipline and workplace rules, due to the discretion granted local managers.

First plaintiffs have produced a good deal of testimony, from plaintiffs and class members alike, describing discriminatory application of various workplace rules and policies (see P. Mem. 17-21). Plaintiffs have also brought evidence of a significant racial disparity in the termination of Nike Chicago employees, showing that during the bulk of the

relevant time period over 33% of African-American employees were terminated for rules violations, as contrasted with less than 8% of Caucasian employees (P. Mem. 21). Nike protests accurately that the statistics do not account for differing circumstances triggering each termination, suggesting that perhaps African-American employees just committed "dischargeable rules violations" more often than Caucasian employees (N. Mem. 49). But once again such an argument, while ultimately relevant, involves exactly the kind of inquiry into the merits that is inappropriate at this stage of the litigation.

As was the case for the Promotion subclass, however, plaintiffs' invocation of the role of "local" managers in effecting disciplinary discrimination limits membership in the Discipline subclass to nonmanagers. What was said in the Promotion section of this opinion on that score applies here with equal force.

As for Nike's challenges to typicality, for the most part they echo its challenges to commonality, and--with one notable exception--similarly fall short. To begin with, the factual differences that likely exist between plaintiffs and class members no more destroy typicality than they destroy commonality. Nor is it the case, as Nike's memorandum suggests (N. Mem. 13-16), that each named plaintiff must have experienced each form of discipline complained of. As this Court has said in Owner-

24

Operator, 231 F.R.D. at 282, a finding of typicality "requires neither complete coextensivity nor even substantial identity of claims." Despite undoubted variations, on the record before this Court the bulk of the claims of the class representatives share the "same essential characteristics as the claims of the class at large" and "arise[ ] from the same...course of conduct" (De La Fuente, 713 F.2d at 232): the subjection of African-American employees to a racially-biased application of workplace rules and discipline.

One final point as to typicality: What was said as to Barlow in the Promotion section applies here as well and calls for his elimination as a representative for this subclass. In fact, Barlow himself admitted that on more than one occasion he issued "the very discipline of which the class complains" (N. Mem. 28). Barlow's elimination not only scotches that aspect of Nike's typicality objection but also one of Nike's two objections as to adequacy.

As to Nike's other adequacy objection, it argues that the named plaintiffs' claims are so weak that they would "jeopardize[ ] the interests" of class members with stronger claims (N. Mem. 28). Robinson v. Sheriff of Cook County, 167 F.3d 1155, 1158 (7th Cir. 1999)(emphasis in original)) has indeed said that one whose "claim is a clear loser" may well be an inadequate class representative. But the claims of the named

25

plaintiffs are clearly not "clear" losers, and short of such
clarity the merits of plaintiffs' claims are again not at issue
at this stage of the litigation. Except for Barlow, then, the
representatives of this class are both typical and adequate.

## Benefits

Nike's employment records reflect that during the relevant
time period Nike Chicago employed over 130 African-Americans in
part-time positions. Once more numerosity is readily satisfied.

There is also no need to reinvent the already-constructed
wheel of commonality for Benefits subclass purposes. Once more
plaintiffs have adduced adequate evidence to support their claim
that all class members--despite variations in their circumstances
and in their susceptibility to potential defenses--have a common
central issue: whether Nike discriminated in applying its
benefits guidelines to African-American employees through a
decentralized "corporate policy" that left such decisions to the
subjective discretion of local managers. Plaintiffs point to the
testimony of a number of plaintiffs and class members who assert
that they were denied employment benefits to which they were
entitled (P. Mem. 22-23; P.R. Mem. 30),[14] then support the

---

[14] Although in the end plaintiffs' evidentiary showing is
sufficient, this Court notes that a number of the plaintiffs'
citations to the record either cited excerpts that were not
provided (see, e.g., P.R. Mem. 30, citing Barbee Dep. 347-48,
Duckworth Dep. Vol. I 141-47), or excerpts that did not support
the proposition for which they were cited (see, e.g., P.R. Mem.
30, citing Readus Dep. 31-32 ).

26

classwide reach of that common question by pointing to the disparity between the raw numbers of Caucasian and African-Americans employed and hired in part-time positions (P.R. Mem. 30-31). Those raw numbers are of course subject to challenge as nondispositive, but that is again a matter to be resolved at trial, not here.

Nor is typicality undermined by individualized differences among named plaintiffs and the subclass at large--such as whether employees were available for full-time hours, the availability of full-time positions, whether employees sought full-time employment and benefits and which benefits were denied. As with previous subclasses, such differences no doubt exist, but again class members and named plaintiffs alike share the same fundamental claim that they were subjected to racially-biased application of Nike's benefit policies. And that is enough to satisfy typicality here.

Finally and with one exception, the named plaintiffs also adequately represent this subclass. As before, Nike's now-familiar "conflict" argument--based this time on (1) competition between plaintiffs and class members for the same full-time positions and (2) "conflicts between the hourly employees who were denied full-time hours and benefits, and the African-American managers who were involved in those decisions" (N. Mem. 28)--fails to convince this Court that plaintiffs are inadequate

27

representatives. This opinion has already made plain this Court's view on "conflicts" due to competition, and this time the absence of managers among the subclass' named plaintiffs adequately addresses Nike's objection to managers representing hourly employees.

That said, however, Nike's concerns as to named plaintiff Barbee are warranted, at least based on the excerpts provided to this Court. Barbee testified that by her own choice she worked only 24 hours a week (her Dep. 349), below Nike's minimum requirement for full-time status and its attendant benefits (P. Ex. 2, DEF 098968-69). Hence Barbee can hardly claim that Nike's denial of full-time benefits was improper, so that--unlike the plaintiffs in the discipline subclass--Barbee's claim is a "clear loser," making her an inadequate class representative (Robinson, 167 F.3d at 1157-58). This Court therefore removes Barbee from the list of this subclass' representatives,[15] but otherwise finds the subclass to have met the Rule 23(a) requirements.

## Rule 23(b)

With Rule 23(a)'s demands having been met, plaintiffs seek

---

[15] Plaintiffs claim that Barbee also testified that she worked more than 30 hours a week (presumably at a different point in her employment), but they did not provide the deposition excerpts that they cited for that proposition (P.R. Mem. 30, citing to Barbee Dep. 347-48). If plaintiffs are able to furnish those missing pages and if those pages show that Barbee in fact qualified for full-time benefits, this Court would be both willing and able (Falcon, 457 U.S. at 160) to consider reinstating Barbee as a representative.

to invoke both Rule 23(b)(2) and Rule 23(b)(3) in their bid to overcome the last certification hurdle (P.R. Mem. 34-42). Rule 23(b)(2) requires that defendant have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole," while Rule 23(b)(3) requires showings that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual class members" and that (2) "a class action is superior to other methods of... adjudication," as well as prescribing factors to be considered in making those two determinations.

Tensions between the different requirements for (and the different consequences of) certification under the Rule 23(b)(2) and (b)(3) provisions, as well as controversy over the class action vehicle as such, have occasioned extensive study that culminated in the 2003 amendments to Rule 23. Now, for example, the always-existing notice and opt-out provisions in Rule 23 (b)(3) (absent in Rule 23(b)(2)) may sometimes be doubled (see Rule 23(e)(C)(3)).

In any event, the lesser demands for Rule 23(b)(2) certification make it a more attractive goal for plaintiffs. But such certification can get trickier when compensatory or punitive relief as well as injunctive or declaratory relief is sought, for

binding class members to individualized damages decisions (absent an opt-out right) can implicate their due process rights (Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, 216 F.3d 577, 580 (7th Cir. 2000)). Understandably plaintiffs here have sought so-called "divided" or "hybrid" certification, under which the classes would be certified under Rule 23(b)(2) as to equitable relief and under Rule 23(b)(3) for monetary relief (see Lemon, 216 F.3d at 581-82). Alternatively plaintiffs seek certification under Rule 23(b)(3) alone.

To begin with, this Court finds that each of the proposed classes qualifies conditionally under Rule 23(b)(2), at least as to equitable relief. Plaintiffs have alleged that Nike acted on grounds generally applicable as to each class and have sought a variety of specific equitable remedies (P.R. Mem. 35-36). But the need for conditional certification stems from the fact that former employees generally lack standing to seek injunctive relief (Hawkins v. Groot Indus., Inc., No. 01 C 1731, 2003 WL 22057238, at *2 (N.D. Ill. Sept. 2)), and plaintiffs' filings to date do not establish that at least some named plaintiff in each class qualifies in that respect (see, e.g., Allen v. Int'l Truck & Engine Corp., 358 F.3d 469, 472 (7th Cir. 2004)).[16] Accordingly certification under Rule 23(b)(2) as to equitable relief will

---

[16] P.R. Mem. 36 says only that two unspecified plaintiffs are current Nike employees and that "several" others, similarly unidentified, seek reinstatement as a remedy.

depend on plaintiffs' early submission of information confirming
that one or more of each class' named plaintiffs have such
standing.

What remains then is to consider whether the predominance
and superiority requirements of Rule 23(b)(3) are met, so as to
permit certification either under that provision alone or in
hybrid terms. Those requirements will be examined successively.

As for predominance, although it calls for a more rigorous
inquiry than commonality and typicality (Amchem, 521 U.S. at 623-
24), it is also not foreclosed by the mere existence of factual
or legal differences within a class (Arenson v. Whitehall
Convalescent & Nursing Home, Inc., 164 F.R.D. 659, 666 (N.D. Ill.
1996)). What is rather required is that a proposed class be
"sufficiently cohesive to warrant adjudication by representation"
(Amchem, 521 U.S. at 623), or in other words that there be "an
essential common factual link between all class members and the
defendant for which the law requires a remedy" (Owner-Operator,
231 F.R.D. at 284).

Here what has been said in the Rule 23(a) analysis also
shows that in each instance the shared common questions, rather
than the admittedly present individualized issues, will be the
focus of litigation (see Adams, 2001 WL 336830, at *18). Indeed,
a number of other courts in this Circuit have found predominance
satisfied even where plaintiffs sought to certify a single class

victimized by a variety of discriminatory conduct (see, e.g., Palmer v. Combined Ins. Co. of Am., 217 F.R.D. 430, 440-41 (N.D. Ill. 2003); Wilfong, 2001 WL 1795093, at *8). By instead carving out subclasses encompassing the several categories of discriminatory conduct, plaintiffs have further enhanced the comparative predominance of those common questions over individualized issues.

Nor do the differences in class members' potential damage recoveries prevent the classes from satisfying predominance (De La Fuente, 713 F.2d at 233). District Courts have available a number of "imaginative solutions" to the problems presented by individual damages issues (Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7ᵗʰ Cir. 2004)), and this Court will be able to address such issues if and when they arise (Adams, 2001 WL 336830, at *17).

That leaves only the question whether a class action provides a superior vehicle for handling this controversy. To begin with, certification of multiple classes is not uncommon (see, e.g., Adams, 2001 WL 336830, at *18; Toney, 1999 WL 199249, at *9-10), and the need for careful administration will pose far fewer problems than the alternative of separate lawsuits by over 230 individual class members, each advancing his or her own assortment of discriminatory actions (see Warnell, 189 F.R.D. at

32

388).[17]

In addition to the considerations of policy and principle

just identified in n.17, duplicative litigation also creates the

undesirable risk of inconsistent determinations on common issues

(D. Mem. 61). And while individual circumstances may vary,

individual lawsuits would compel court after court to hear the

same evidence as to an employer's patterns of assertedly

discriminatory conduct--a wasteful prospect as well. Finally, it

must not be forgotten that at this stage the proper focus is on

liability, not damages--another thumb on the scales favoring

class certification.

---

[17] This Court is wholly unpersuaded by the hostile-
environment argument (almost generically applicable to all class
actions) that Nike advances near the end of its opposition
memorandum (N. Mem. 61):

> Finally, because of the relatively small size of the
> class and the fact that virtually all of the class
> members reside in this judicial district, individual
> lawsuits are feasible.

Indeed, one of the main justifications for class actions as such
is the unfair tactical advantages that can be conferred on
defendants by forcing the institution of individual actions (even
before the newly-announced increase in filing fees, 230 lawsuits
at $250 a copy would have cost $57,500 in such fees), carrying
with them the concomitant need of employees with far lesser
resources than their employer defendants to incur multiple legal
fees to pursue their individual claims. In those respects
Rule 23 certification may serve to level the playing field in an
area where economic forces can too readily force the abandonment
of meritorious claims (though this Court recognizes there are
some principled arguments on the other side of the debate, in
situations such as the present one they are substantially
outweighed by those supporting certification).

33

## Conclusion

In summary of what has gone before:

  1. With modest limitations discussed earlier, Rule 23(a) has been satisfied as to the overall class and each subclass.

  2. That is true as well as to Rule 23(b)(3) and, conditionally, as to Rule 23(b)(2).

Two things remain for plaintiffs--as a procedural matter, an amendment of the Complaint to conform to the current class and subclass definitions, and as a more substantive matter, their submission of the information needed to rule finally as to Rule 23(b)(2) certification.  Finally, this action is set for a status hearing at 8:45 a.m. March 29, 2006 to discuss the timetables for those open items and for the further proceedings in this action.

Milton I. Shadur
Senior United States District Judge

Date: March 22, 2006

34