**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEITH SMITH, RIA MCDOUGAL, JOHN LEWIS, VERNETTA DUCKWORTH, JANISE PAGE, JACQUES WALKER, SHU-RA ROGERS, TODD LINDBERG, ANTHONY BROWN, JASON READUS, DWIGHT BROWN, ROBERT JACKSON, BILLY BROWN, CRYSTAL BARBEE, MARQUISHA HUDSON, DAJUANA YOUNG, ANTHONY BARLOW, LARRY POSEY, On behalf of themselves and a class of similarly situated African-American employees, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 03 C 9110<br><br>Judge Milton I. Shadur<br><br>Magistrate Judge Denlow |
| Plaintiffs, | ) | |
| v. | ) ) | |
| NIKE RETAIL SERVICES, INC., a.k.a. Nike | ) ) ) | |
| Defendant. | ) | |

**CLASS COUNSEL'S UNOPPOSED PETITION FOR ATTORNEYS' FEES AND COSTS**

Plaintiffs, by and through their attorneys, respectfully request that this Court grant Class Counsel's Unopposed Petition for Attorneys' Fees and Costs in the total amount of $2,600,000. The attorneys' fees requested here represent slightly less than 33.33 % of the total $7,600,000 settlement fund obtained on behalf of approximately 400 African American individuals in this employment discrimination class action. As detailed below, this amount includes approximately $140,000 for out-of-pocket costs and expenses incurred by Class Counsel in litigating this action, along with

1

$2,460,000 for attorneys' fees.[1] Notably, under the lodestar method for calculating attorneys' fees, Class Counsel's fees to date total $2,192,286. An award of $2,460,000 as a total award of attorneys' fees amounts to a slight enhancement of Class Counsel's current lodestar fees by a modest multiplier of less than 1.125. Even without the use of a multiplier, however, as detailed below awarding Class Counsel $267,714—in addition to the $2,192,286 attorneys' fees reasonably incurred to date—is wholly appropriate in light of the attorneys' fees that will be incurred in assisting class members during the claim filing process, in monitoring the Defendant's compliance with the parties' Settlement Agreement and Consent Decree ("Consent Decree"), and in overseeing the implementation of the specific injunctive relief provided under the Consent Decree over the next two years.

## I. INTRODUCTION

On December 17, 2003, Plaintiffs Keith Smith and Ria McDougal filed a *pro se* complaint asserting claims of race discrimination and harassment against the Defendant and seeking relief on behalf of themselves and a class of similarly situated individuals. The Court appointed Noelle Brennan and Ines Monte of the law firm of Brennan & Monte, Ltd. to serve as counsel for Plaintiffs Smith and McDougal on March 18, 2004. Plaintiffs' counsel subsequently filed an Amended Complaint alleging that the Defendant discriminated against several classes of current and former African American employees by: creating and maintaining a hostile work environment; segregating African Americans into lower paying jobs; denying African Americans promotions because of race; issuing discipline, including terminations, based on race; and denying certain benefits based on race.

---

1 As detailed in the Declaration of Noelle Brennan, attached as Exhibit A, the out-of-pocket expenses incurred to date in this litigation total slightly more than $50,000. However, under the Decree, the Plaintiffs must also bear the cost of the Claims Administrator and all costs related to the Claims Review process and the administration of the

The Amended Complaint also included individual claims on behalf of eighteen individually named Plaintiffs, including Smith and McDougal. On March 16, 2005, Randall Schmidt of the University of Chicago's Edwin F. Mandel Legal Aid Clinic was granted leave to file his appearance as co-counsel on behalf of the named Plaintiffs.

Plaintiffs moved for class certification of five classes in this lawsuit in December 2005. On March 22, 2006, the Court issued its Memorandum Opinion and Order certifying the classes identified in the First Amended Complaint and designating the attorneys at Brennan and Monte, Ltd. along with Randall Schmidt of the Mandel Legal Aid Clinic as Class Counsel. On July 30, 2007, the Court entered an Order preliminarily approving the parties' jointly presented Consent Decree. A fairness hearing is scheduled for October 2, 2007, after which the Court will determine whether to enter an Order finally approving the parties' Consent Decree. Pursuant to the terms contained in the Consent Decree, Class Counsel hereby submits this Unopposed Petition for Attorneys' Fees and Costs.

## II. HISTORY OF LITIGATION

The results obtained by Class Counsel on behalf of approximately 400 African American former and current employees of Defendant are significant. Under the terms of the proposed Consent Decree, Nike has agreed to pay $7.6 million to resolve the race discrimination and race harassment claims of class members belonging to five different classes. In addition to this substantial monetary relief, Nike has also agreed to significant equitable relief for the classes including: a Court appointed Diversity Consultant to monitor and periodically report to the Court regarding Niketown Chicago's compliance with the Consent Decree; appointment of a Compliance

---

settlement funds. A conservative and reasonable approximation of the costs for these administrative and claims

Officer at Nike's World Headquarters; designation of an Ombudsperson at Niketown Chicago; diversity training of all supervisors and managers at Niketown Chicago; the creation of store-wide objectives focused on providing equal employment opportunities for all employees; creation of a formal mentoring program for African-American employees; the review and revision of Niketown Chicago's human resources practices; and review and revision of Niketown Chicago's loss prevention practices to eliminate any disparate treatment of African-American employees and customers.

The successful resolution of this class action has been extremely hard fought. The considerable equitable and monetary relief obtained on behalf of the classes in this case reflects, in part, a substantial amount of work performed by Class Counsel as reflected in the attached chart summarizing the hours spent by Class Counsel and their legal staff on this litigation. *See* Exhibit A-2. Between March of 2004 and the present date, Class Counsel and their staff devoted over 7,900 hours to the successful litigation of this complex class action. As described in greater detail below, the work performed included significant fact investigation and development to support the claims made for the five separate classes certified in this case. The work also involved extensive written and deposition discovery, substantial legal research and analysis, and complex briefing of legal arguments and motions.

In March of 2004, when Brennan & Monte Ltd. was appointed by the Court to represent the two original plaintiffs, Keith Smith and Ria McDougal, the attorneys at Brennan & Monte had already met with the plaintiffs to discuss their possible representation. *See* Exhibit A, Declaration of

---

review activities to be performed by outside third parties is $90,000.

4

Noelle Brennan**.** Notably, at that time, Brennan & Monte was a brand new law firm, having been open for business for less than four months. At the time of the Court's appointment, the firm employed only two attorneys, the founding shareholders, Noelle Brennan and Ines Monte. The firm did not yet employ any other professional support staff. *Id*. Notwithstanding these limitations, Class Counsel undertook significant risks and lost opportunity costs in order to properly represent the plaintiffs. First, the firm engaged in necessary but taxing extensive factual investigation to determine if there was a reasonable basis to bring class-wide discrimination claims. Thus, immediately after the Court's appointment, Class Counsel contacted hundreds of current and former Nike employees, conducted extensive interviews with dozens of potential plaintiffs, class members and/or witnesses, reviewed extensive documentation provided by various individuals, conducted a review and analysis of documents produced to the Equal Employment Opportunity Commission ("EEOC"), conducted a series of analyses of raw data regarding the racial makeup of Nike and gathered extensive anecdotal evidence of race discrimination. This intense factual investigation consumed a huge part of Brennan & Monte's resources for the five months between the appointment and the filing of the Amended Complaint in August of 2004.

During that same time, Class Counsel agreed to represent an additional sixteen individual Plaintiffs, in addition to Smith and McDougal. Significant legal analysis was required to assess both the individual and class allegations to pursue in this case. As the Court is aware, Class Counsel has litigated this case diligently and forcefully. In response to the aggressive defense mounted by Nike, and in support of the individual and class claims included in the Amended Complaint, Class Counsel was required to engage in extensive legal briefing and motion practice to vigorously protect and advance the classes' interests. This included filing motions for protective orders, filing emergency

motions limiting discovery by Nike, responding to Nike's motions to dismiss, responding to Nike's motions for clarification of the Court's Orders, bringing and defending against motions to compel, and numerous other motions relating to significant discovery disputes.

Written discovery was itself intense, protracted and, at times, contentious. An immense amount of time was spent gathering the necessary factual information to respond to the Defendant's detailed sets of written interrogatories, as well as the Defendant's numerous requests for the production of documents. Analyzing and organizing the information for the responses to these written discovery requests was a highly time-intensive task. Class Counsel spent thousands of hours reviewing and analyzing over 100,000 documents produced by Nike, preparing the named plaintiffs for their depositions, and defending those depositions. Notably, Nike's depositions of the named plaintiffs often extended over a two day period. Similarly, a significant number of hours were spent preparing and taking the depositions of key human resources and management officials at Nike's headquarters in Oregon and completing necessary Rule 30(b)(6) depositions locally.

Apart from these tasks, Class Counsel also spent hundreds of hours in efforts to successfully obtain class certification for five separate classes in this case. Not surprisingly, the Plaintiffs' motion for class certification was strongly opposed by Nike and significant work was required to prevail. Even after prevailing, however, Class Counsel was required to oppose Defendant's Rule 23(f) petition for interlocutory appeal to the Seventh Circuit. In addition, Class Counsel spent significant amounts of time opposing Nike's attempt to file a motion for summary judgment, opposing Nike's attempt to take depositions of numerous unnamed class members, opposing Nike's attempt to require answers to interrogatories on behalf of absent class members, among other things.

Reaching the compromise reflected in the pending Consent Decree was itself a long and

arduous process, involving significant amounts of time in both legal and factual analysis related to the separate classes and their damages. Considerable time was spent engaging in on-going negotiations, as well as formal mediation sessions. Finally, extensive work and time were required during the process of drafting and redrafting the specific complex provisions and exhibits that were finally agreed to as part of the Consent Decree.

Class Counsel's work is far from complete. Specifically, Class Counsel will be assisting named Plaintiffs as well as other class members in completing Claim Forms. Moreover, Class Counsel will be required to spend substantial time monitoring the implementation of the Consent Decree and reviewing documents and data related to the Consent Decree. In light of the approximately 400 class members and the ongoing work involved with monitoring the Consent Decree, this additional work can reasonably be expected to take at least seven hundred fifty additional hours of attorney time and one hundred fifty hours of paralegal time. Based on a current hourly rate of $355 for attorney time (the average hourly rate of lead Class Counsel) and $90 per hour for paralegal time, a conservative estimate of the additional fees is $279,750. *See* Exhibit A, Declaration of Noelle Brennan. Class counsel only seeks $267,714 for such fees.

### III. LEGAL ARGUMENT

In considering Class Counsel's Unopposed Petition for Attorneys' Fees and Costs, the Court should be guided by the relevant decisions of the Seventh Circuit directing the district courts to do their "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001); *see also Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir.

1994) (directing district court to determine fair attorneys' fees in class action by considering the probability of success at the outset of the litigation).

Here, the Consent Decree creates a common fund of $7.6 million, constituting relief for class members who submit claim forms, reasonable incentive fees for the named plaintiffs, all attorneys' fees and costs (including future attorneys' fees), and any future administration costs (excluding the fees charged by the Court-appointed Diversity Consultant which must be borne by Defendant). The attorneys who help to create a fund or benefit for all class members may receive fees and expenses directly from the common fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The decision whether to use the lodestar method or the percentage approach in common fund cases is within the discretion of the district court. *Harman v. Lyphomed, Inc*. 945 F.2d 969, 975 (7th Cir. 1991); *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994).

In either case, however, the risk incurred by undertaking the litigation is a very important factor in determining the appropriate award of reasonable attorneys' fees. As stated in *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 572 (7th Cir. 1992), "class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." *Id.* at 572.

The common fund doctrine serves as a catalyst for settlement because it enables the defendant to place a ceiling on its liability and avoid separately litigating attorneys' fee and costs. Class actions brought under statutes containing fee-shifting provisions, such as Title VII, may properly be treated as to common fund cases at the time of settlement. *Skelton v. General Motors Corp.,* 860 F.2d 256 (7th Cir. 1988), cert. denied, 493 U.S. 810, 110 S. Ct. 53, 107 L. Ed. 2d 22 (1989). *Id.* at 256. The Seventh Circuit, as well as other federal circuit courts, has rejected the

argument that statutes containing fee-shifting provisions are not subject to the percentage of a common fund payment for attorneys' fees. *Florin,* 34 F.3d at 564 ("[C]ommon fund principles properly control a case which is initiated under a statute with a fee-shifting provision, but is settled with the creation of a common fund."); *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998); *Staton v. Boeing Company*, 327 F.3d 938, 967 (9th Cir. 2003); *Brytus v. Spang & Co.*, 203 F.3d 238, 246-247 (3rd Cir. 2000). This doctrine has been applied to Title VII class actions in the Seventh Circuit. *Alexander v. Chicago Park District*, 927 F.2d 1014 (7th Cir. 1991); *Jones v. R.R. Donnelley & Sons,* 2004 U.S. Dist. LEXIS 1316 (N.D. Ill. Jan. 3, 2005) (awarding plaintiffs' attorneys one-third of the common fund recovered for class); *Wilfong v. Rent-A-Center,* 2002 U.S. Dist. LEXIS 28016 at * 29 (S.D. Ill. October 4, 2002) (awarding plaintiffs' attorneys $10.5 million dollars based on a percentage of the common fund).

In common fund cases, the approach favored in the Seventh Circuit is "to compute attorney's fees as a percentage of the benefit conferred on the class," particularly where that percentage of the benefit approach replicates the market. *Williams v. General Elec. Capital Auto Lease, No.* 1995 WL 765266 at *9 (N.D. Ill. Dec. 26, 1995); *see also Long v. Trans World Airlines, Inc.*, 1993 U.S. Dist. LEXIS 5063 at *1 (N.D. Ill. Apr. 19, 1993).

Here, Class Counsel seek attorneys' fees that amount to slightly less than one-third of the common fund, or $2.46 million.[2] This award is appropriate because it accurately replicates the market. Herbert Newberg & Alba Conte, *Newberg on Class Actions,* § 14.06 at 551 ("empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery"); *Gaskill v. Gordon,* 160 F.3d 361,

---

2 The percentage sought in attorneys' fees is actually just under 32.37%.

362 (7th Cir. 1998) ("most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis" and the "typical contingent fee is between 33 and 40 percent"). Class Counsel previously entered into one-third contingency fee arrangements (plus costs) with the individually named Plaintiffs and thus, the named Plaintiffs had previously agreed pay this percentage of any award. *See* Exhibit A*,* Declaration of Noelle Brennan. Similarly, the Preliminary Notice issued in this litigation stated that Class Counsel would be petitioning the Court for fees and costs up to $2.6 million out of the overall fund. There were no objections filed to the proposed settlement. The absence of any objection should carry substantial weight, because frequently, class members do object to attorneys' fee awards. *See Vizcaino v. Microsoft Corp.,* 2002 U.S. App. LEXIS 9188 at *4 (9th Cir. May 15, 2002); *Mangone v. First USA Bank,* 206 F.R.D. 222, 236 n.3 (S.D. Ill. 2001).

    Moreover, case law and awards in other common fund cases supports awarding this percentage. *Teamster v. Inter-Rail Transport,* 2004 U.S. Dist. LEXIS 636 (N.D. Ill. 2004) (fee awards in class actions are commonly one- third of settlement); *Cullen V. Whitman,* 197 F.R.D. 136, 147 (E.D. Pa. 2000) (awarding one-third of common fund); *Retsky v. Price Waterhouse,* 2001 U.S. Dist. LEXIS 20397 (N.D. Ill. 2001) (awarding one-third of common fund); *Goldsmith v. Technology Solutions,* 1995 U.S. Dist. LEXIS 15093 at *26 (N.D. Ill. Oct. 10, 1995) (collecting cases reflecting that "courts in this District commonly award attorneys' fees equal to approximately one-third or more of the recovery"); *Mister v. Illinois Central Gulf Railroad Co.,* No. 81-3006 (S.D. Ill. Aug. 5th, 1993) (awarding 40% of a common fund of $10 million). The fact that the Named Plaintiffs have previously agreed to this arrangement and that no class members objected to Counsel's fees, in conjunction with the supporting case law, indicates that Class Counsel's fee petition is both reasonable and accurately replicates the market.

Alternatively, Class Counsel requests that the Court award a lodestar with a multiplier of less than 1.125. The lodestar approach to the award of attorneys' fees initially involves multiplying the number of hours reasonably spent on the case by a reasonable hourly billing rate. Once this is calculated, application of a multiplier can be considered to account for contingency, complexity, risks, and result. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470-73 (2nd Cir. 1974*).* In *Florin,* the Seventh Circuit used a lodestar method with a multiplier, noting that a multiplier is "mandated**,** if the court finds that counsel had no sure source of compensation for their services." *Id.,* 34 F.3d at 565. The Court further explained that "we have observed that the need for such an adjustment [of a multiplier] is particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *Id.* (internal citations omitted). In determining whether to assess a multiplier, the court must assess the "riskiness of the litigation by measuring the probability of success of this type of case *at the outset* of the litigation." *Id.* at 565; *Harmon v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991).

Where risk of prevailing in the litigation is high, and the Plaintiffs would have faced substantial difficulties in finding counsel, an upward adjustment in the lodestar is justified. Here, the original Plaintiffs Smith and McDougal had substantial difficulties in finding counsel, indicating that this case posed significant risks. As a result, this Court appointed counsel for them.[3] *See* Order of March 18, 2004. Moreover, because Class Counsel risked non-payment of *any* fees, an upward adjustment is appropriate and necessary. *Florin,* 34 F.3d at 564. The multiplier sought here of less than 1.125 is actually less than those awarded in other cases. *In Re Abbott Laboratories Securities*

---

3 The fact that the Court appointed Class Counsel initially does not minimize the risk of having taken and pursued the case as a class and with additional Named Plaintiffs. Under these circumstances, and with a very well-funded Defendant, many attorneys appointed under the same conditions may have simply pursued a quick settlement for the

11

*Litigation,* 1995 WL 792083 (N.D. Ill. July 3, 1995) (finding 1.79 multiplier to be modest); *Davitt v. Information Resources Inc.,* 1995 WL 792983 at *18 (N.D. Ill. April 19, 1995) (awarding a multiplier of 2); *Guthrie County State Bank v. Mahlmann*, 869 F. Supp. 669 (N.D. Ill. 1992) (approving 2 multiplier). *See also* Herbert Newberg & Alba Conte, Newberg on Class Actions, § 14.03 at 14-15 (3rd ed. 1992) ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."). Thus, should the Court determine not to use a percentage of the fund method for awarding reasonable attorneys' fees, Class Counsel asks that the Court apply a lodestar with a multiplier of less than 1.125, resulting in attorneys' fees of $2,460,000.

The requested award of fees is consistent with the law involving class action settlements and it is fair, adequate, and reasonable. The facts to be considered in class action fee awards, whether measured by a percentage of the common fund approach, or the lodestar approach, include the time and labor expended by counsel; the degree of success obtained; the magnitude, complexities, and difficulties of the litigation; the preclusion of employment by the Plaintiffs' attorneys due to acceptance of the case; the risk of the litigation; the quality of the representation and the legal skills required; the requested fee in relation to the settlement and contingency fee nature of the case; the customary fee, the market rate and awards in similar cases; and public policy considerations. *Mathure v. Bd. Of Trustees,* 317 F.3d 738, n.1 (7th Cir. 2003); *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2nd Cir. 2000).

---

two Plaintiffs and no relief for the class.

**A.     Time/Labor Expended by Class Counsel and Preclusion of Other Employment**

From the time Class Counsel started investigating this case through the present, Class Counsel and Defendant's counsel have litigated this case vigorously. The need to match the extensive efforts and resources of Defendant and its counsel required extensive time and labor. Brennan & Monte's attorney hours alone are over 4,300, requiring that the firm litigate this matter over the last three and one half years to the exclusion of others in which it might have engaged. Randall Schmidt's hours to date are approximately 850. The scope of legal and factual matters raised in this litigation were extensive and thus, extraordinarily time-consuming. In addition, Class Counsel anticipate spending approximately 750 additional attorney hours on assisting the named Plaintiffs and class members with completing the claims process, monitoring the implementation of the Consent Decree and working with the Diversity Consultant and defense counsel on matters that will inevitably be raised in the future. *See* Exhibit A*,* Declaration of Noelle Brennan. Class Counsel also anticipate incurring additional paralegal hours of at least 150 hours in the future. *Id.*

**B.     Magnitude, Complexities, and Difficulties of the Litigation**

Employment discrimination class actions are typically both factually and legally complex and difficult, and this case was particularly so. Aside from the work done in the District Court, this case was also litigated in front of a magistrate judge and in the Seventh Circuit. Class Counsel worked with a large class and with complex legal issues, reviewed tens of thousands of pages of documents and computer data, took and defended dozens of extremely contentious depositions, and contacted and sought to interview several hundred potential class members and witnesses. Class Counsel engaged in extensive motion practice, including filing motions for protective orders, filing of emergency motions limiting discovery by Nike, responding to motions to dismiss, responding to

13

motions for clarification of the Court's Orders, bringing and responding to motions to compel and other discovery disputes, among other things. The time spent preparing for and obtaining class certification was extensive and notably, the Court certified *all* of the classes pursued by Class Counsel. Even the mediation and settlement of this case took an entire year, in light of the complex matters raised by the injunctive relief sought by Class Counsel, as well as the significant monetary relief sought.

### C. The Risk of the Litigation

Courts recognize that the riskier the case, the greater the justification for a substantial fee award. The riskiness of the case must be assessed at the time the litigation is commenced. *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). Employment discrimination class cases are particularly risky. The time and resources required to pursue such cases, in combination with the likelihood of receiving no recovery, results in a small number of attorneys willing to take on plaintiff employment class action cases. Moreover, race-based class actions alleging a "hostile environment" theory are still relatively novel and few cases have succeeded in obtaining class certification for a racially hostile environment. Defendant's relentless and vigorous disagreement with Plaintiffs' theory of the case (both factual and legal) highlights the risk entailed in pursing the litigation. There was a likelihood that the Court would not certify all or any of the classes and counsel knew at the outset that this case would be extremely costly and time-consuming.

Defendant is a well-financed opponent with capable and experienced counsel from two law firms, including an employment law firm with hundreds of attorneys and legal professionals. In light of the fact that Brennan & Monte was both relatively new at the commencement of this case and the fact that it was a two attorney firm (now grown to a three attorney firm), the risk of pursuing this

litigation, to the exclusion of many others, was substantial. Had Class Counsel lost on any of the many grounds put forth by Defense counsel, or at trial, the impact on Brennan & Monte, Ltd. would have been very serious. Although the addition of Randall Schmidt and the legal students at the University of Chicago helped spread some of the work, it did not minimize the risk undertaken by Brennan & Monte. All of these facts support both the percentage of the fund requested, as well as the enhancement of the lodestar, as Class Counsel should be compensated for taking on such a substantial risk of non-payment.

### D. Quality of the Representation, Skills Required, and Results

The results obtained for the benefit of the class are substantial. In addition to the monetary relief of $7.6 million, Class Counsel obtained *significant* injunctive relief, despite the opposition of the defendant. Class Counsel obtained injunctive relief including: a Court appointed Diversity Consultant to monitor and periodically report to the Court regarding Niketown Chicago's compliance with the Consent Decree; appointment of a Compliance Officer at Nike's World Headquarters; designation of an Ombudsperson at Niketown Chicago; diversity training of all supervisors and managers at Niketown Chicago; the creation of store-wide objectives focused on providing equal employment opportunities for all employees; creation of a formal mentoring program for African-American employees; the review and revision of Niketown Chicago's human resources practices; and review and revision of Niketown Chicago's loss prevention practices to eliminate any disparate treatment of African-American employees and customers. Notably, all of Nike's policies relating to promotions, discipline, loss prevention and equal employment practices will be subject to review and reform. The Consent Decree will be in place for a period of two years.

The quality and skill of Class Counsel is reflected in the both the results obtained in the litigations, as well as this Court's previous findings when certifying the classes. Randall Schmidt has practiced in the area of employment discrimination for more than twenty years and has been the head of the University of Chicago's Edwin F. Mandel Legal Aid Clinic for more than twenty years. Noelle Brennan has practiced exclusively in the area of employment discrimination for more than ten years and has litigated several successful large plaintiff class action cases. Ines Monte has similarly practiced in the area of employment discrimination for more than ten years and has also litigated large plaintiff class action cases. *See* Exhibit A, Declaration of Noelle Brennan.

### E.     Market Rate, Customary Fee, and Awards in Similar Cases

The first and best benchmark for establishing the appropriate rate in a particular case is the terms of actual fee agreements between counsel and individual class members in the present litigation. *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time"). Here, Class Counsel entered into a one-third contingency fee arrangement with the named Plaintiffs, which demonstrates that these Plaintiffs and Plaintiffs in similar cases are willing to pay such amounts. Class Counsels' actual hourly rate, as itemized in the attached Declaration of Noelle Brennan, are current rates actually paid by Brennan & Monte's paying clients.[4] In awarding fees, courts typically use an attorneys' current rate to account for the delay in payment. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 716 (1987). Here, the rates used for calculating the overall attorney rates are counsels' current

---

4 On September 1, 2007 the hourly rates billed for Noelle Brennan and Ines Monte increased from $300 an hour to

hourly rates. Such rates are reasonable in this market. *Levitan v. McCoy,* No. 00 C 5096 (N.D. Ill. March 8, 2007) (finding the following rates reasonable: $680 for a 1977 graduate; $475 for a 1981 graduate; $315 for a 1997 graduate; and $315 for a 2001 graduate); *Hispanics United v. Village of Addison,* 94 C 6075 (N.D. Ill. Aug. 17, 2004) ($545 for a 1972 graduate and $380 for a 1994 graduate).

In addition, as discussed above, no class members have objected to the requested fees and costs, which were specified in the Preliminary Notice. Further, defense counsel has agreed to not object to any fee and cost petition up to $2.6 million, suggesting that defense counsel finds Class Counsel's request reasonable and within the range of market rate. As explained by the Seventh Circuit, "class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." *In re Continental Ill. Sec. Litig.,* 962 F.2d at 572.

As addressed above, one third percentage recovery is the customary rate in contingency percentage recoveries approved in common fund settlements in the Northern District of Illinois. *Liebhard v. Square D Co.,* No. 91 C 1103 (N.D. Ill. Jun. 6, 1993) (J. Plunkett) (awarding fees of one-third of the fund plus expenses); *Wanninger v. SPNV Holdings,* No. 85 C 2081 (N.D. Ill. May 10, 1993) (J. Marovich) (32% awarded, plus expenses); *Long v. Trans World Airlines, Inc.,* No. 86 C 7521, 1993 U.S. Dist. LEXIS 5063 (N.D. Ill. Apr. 15, 1993) (J. Williams) (32% plus expenses); *Hammond v. Hendrickson,* No. 85 C 9829 (N.D. Ill. Nov. 20, 1992) (J. Aspen) (one-third of fund,

---

$325 an hour.

plus expenses); *First Interstate Bank of Nevada, N.A. v. National Republic Bank of Chicago,* No. 80 C 6401, slip op. at 2 (N.D. Ill. Feb. 12, 1988) (J. Plunkett) (awarding 39% of settlement fund).

Finally, federal courts in Illinois have awarded similar attorneys' fees in Title VII cases. *Jones v. R.R. Donnelley & Sons,* 2005 U.S. Dist. LEXIS 1316 (N.D. Ill. Jan. 3, 2005) (awarding plaintiffs' attorneys one-third of the common fund recovered for class); *Wilfong v. Rent-A-Center,* 2002 U.S. Dist. LEXIS 28016 at * 29 (awarding plaintiffs' attorneys $10.5 million dollars based on a percentage of the common fund).

### F. Public Policy Considerations

In this case, individuals banded together to bring a suit that required far too much time and expense for any single person, with the goal of securing compensation for the Plaintiffs' injuries, obtaining injunctive relief, and deterring the company from continuing its practices of race discrimination and harassment. Congress and the Courts have repeatedly recognized the strong public interest in the enforcement of civil rights and anti-discrimination laws. *Riverside v. Rivera,* 477 U.S. 561, 574-75 (1986) ("a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms … the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future … a plaintiff who obtains relief in a civil rights lawsuit does so not for [her]self alone but also as a 'private attorney general' vindicating a policy that Congress considered of the highest importance.") (internal citations omitted). Here, awarding reasonable fees and expenses to Class Counsel in this case promotes the public policies underlying class actions, 42 U.S.C. Sec. 1981 and Title VII.

For the reasons explained above, Class Counsel respectfully requests that this Court approve Class Counsel's unopposed petition for attorneys' fees in the amount of $2.46 million and costs in the amount of $140,000.

RESPECTFULLY SUBMITTED,

_/s Noelle Brennan_____
By One of Plaintiffs' Class Counsel

Noelle Brennan
Ines Monte
BRENNAN & MONTE, LTD.
20 South Clark Street
Suite 1530
Chicago, Illinois 60603
(312) 422-0001
(312) 422-0008 (fax)

October 1, 2007